WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR12-01793-PHX-DGC |
| Plaintiff, | **ORDER** |
| v. | |
| Muhammed Hussain Muhammed et. al, | |
| Defendants. | |

Defendant Muhammed Hussain Muhammed has been indicted on 34 counts, including conspiracy to commit Hobbs Act robbery in violation of 18 U.S.C. § 1951, conspiracy to possess with intent to distribute marijuana in violation of 21 U.S.C. § 846, and conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h). Doc. 167. Defendant has filed a motion to suppress statements made to law enforcement officers on July 7, 2010, and October 25, 2012. Doc. 311. The motion is fully briefed and no hearing has been requested. For the reasons set forth below, the Court will grant in part and deny in part Defendant's motion.

I.     **Background.**

The government alleges that Defendant led a group that committed violent armed robberies of marijuana traffickers and arranged for the transportation, distribution, and sale of marijuana in Illinois, Minnesota, and Georgia. Doc. 331 at 2. The statements at issue in this motion were made by Defendant during four interactions with law enforcement officers.

**A.      July 2, 2010, at La Quinta Hotel.**

On July 2, 2010, Defendant was in a room with Dominic Chatman, Robert Barber, Charles Smith, and Ashlea Staugh at a La Quinta hotel in Bloomington, Indiana.  Four officers from the Bloomington Police Department monitored the hotel for narcotics trafficking, and the room occupied by Defendant and others attracted their attention.  The officers detected the scent of marijuana and heard the sound of an aerosol sprayer when standing outside the room.   The officers knocked, and Staugh, whose name appeared on the guest registry, opened the door.  The officers identified themselves, explained why they had come to her room, and asked to enter.  Staugh consented.  When the officers entered the room, they again detected the odor of raw marijuana.  The officers addressed the occupants of the room collectively and asked whether there was marijuana in the room.  Defendant said there was a small amount, and another of the occupants pulled two bags of marijuana from his pocket.  When the officer asked for consent to search the room, Defendant allegedly said there was no need.  The officers asked about duffle bags and a garbage bag located near one of the beds, and Defendant allegedly said "he knew he shouldn't have let that guy leave those bags there."  When the officers asked if the group had a vehicle, Defendant responded that they had a black suburban in the parking lot rented from the airport under his name.  The officers directly addressed Staugh and asked for consent to search the room, but she said no.   The officers detained the occupants of the hotel room, obtained a warrant to search the room, and ultimately arrested all five occupants.

**B.      July 2, 2010, at Police Station.**

Later that evening, two officers recorded an interview of Defendant at the Bloomington police station.  The officers asked Defendant to give his height, birthday, and place of residence, and engaged in innocuous pre-*Miranda* banter about cars and the weather in their home cities.  The officers also asked Defendant if he had rented the car found at the hotel in his own name.

1    Following a *Miranda* warning, Defendant said "I got a lawyer."  The officers

2   asked whether Defendant would be willing to waive his *Miranda* rights, and Defendant

3   suggested that he might if he could receive early release.  When the officers told

4   Defendant that they were unsure what effect his waiver would have on his release,

5   Defendant said he would rather have his attorney present for any questioning.  The

6   officers said they would stop the questioning and proceeded to ask questions they said

7   were necessary to process Defendant.  The officers asked Defendant how much money he

8   had on his person, how much money he had in the hotel room, whether $2,500 found in

9   the hotel room belonged to him, the location of Defendant's money in the room, the kind

10  of pants the money was in, and which duffle bag in the room belonged to Defendant.

11         **C.     October 25, 2012, at Defendant's Home.**

12         On October 25, 2012, federal agents executed search and arrest warrants at

13  Defendant's residence.  After the residence was secured, ATF Special Agent ("SA")

14  Moran spoke with Defendant to explain what was happening.  SA Moran asked

15  Defendant a series of questions to evaluate whether the ATF caused any unnecessary

16  damage when entering the home and executing the warrants.  Defendant responded to

17  these questions.  Defendant then uttered under his breath that he was glad he did not grab

18  his "gauge," referring to a shotgun.

19         **D.     October 25, 2012, at Police Station.**

20         Later that evening, Defendant was interviewed at a police station.  He was

21  handcuffed by one hand to a table in the interview room.  Before the interview began and

22  while he was alone in the room, Defendant yelled statements such as "Alright family,

23  you're all good," "Everybody hold it down, hold it down," and "Hey Sharay, you're

24  good."   When Detective Westover entered the interview room, and before any

25  questioning, Defendant said that his family could hear him.  Defendant then said "I know,

26  you gotta figure out what's going on and then come to me and hit me with all the

27  [expletive]."  Defendant asked how many people had been arrested and if the police had

28  people from the high school too or the bakery shop on Cave Creek.  Defendant then

1    yelled out again, "You're all good."  Westover still had not spoken to Defendant.

2         Detective Westover left briefly, but reentered the room and talked to Defendant

3    about his arrest and answered questions about his family and girlfriend.   Detective

4    Westover then read Defendant his *Miranda* rights, to which Defendant responded "Yeah,

5    and I would like to speak to an attorney."  Detective Westover nevertheless continued to

6    converse with Defendant and offered to answer any questions.   Detective Westover

7    informed Defendant of the charges he faced and that his family would face.  Defendant

8    responded that it was a matter of "he said, she said," and that he buys and sells cars.

9    **II.    Legal Standard.**

10        The Fifth Amendment provides that "[n]o person . . .  shall be compelled in any

11   criminal case to be a witness against himself."   U.S. Const. amend. V.   In *Miranda v.*

12   *Arizona*, 384 U.S. 436, 444-45 (1966), the Supreme Court adopted prophylactic measures

13   to guarantee that a suspect is advised of his Fifth Amendment rights before a custodial

14   interrogation.   *Miranda* warnings must be given only when a suspect is both in custody

15   and subject to government interrogation.  *Ill. v. Perkins*, 496 U.S. 292, 297 (1990).   Once

16   the accused requests counsel during such an interrogation, law enforcement officers may

17   not re-initiate questioning until counsel has been provided unless the accused initiates

18   further communication.   *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981).   A suspect

19   must clearly articulate his desire for counsel before police must stop questioning.   *See*

20   *Davis v. United States*, 512 U.S. 452, 460-01 (1994); *Berghuis v. Thompkins*, 560 U.S.

21   370 (2010) (reaffirming the *Davis* rule that invocations must be unambiguous).

22        Even when not in formal police custody, a suspect is considered to be "in custody"

23   for purposes of *Miranda* if he has been "deprived of his freedom of action in any

24   significant way."  *Miranda*, 384 U.S. at 444.  Custody is determined by whether, under

25   the totality of the circumstances, a reasonable person would not feel free to end the

26   encounter and leave.  *See Yarborough v. Alvarado*, 541 U.S. 652, 663-65 (2004).   The

27   Ninth Circuit has identified several factors for determining whether a person was in

28   custody: "'(1) the language used to summon the individual; (2) the extent to which the

defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual.'"   *United States v. Kim*, 292 F.3d 969, 974 (9th Cir. 2002) (quoting *United States v. Hayden*, 260 F.3d 1062, 1066 (9th Cir. 2001)).   These considerations are not exhaustive; "[o]ther factors may also be pertinent to, and even dispositive of, the ultimate determination whether a reasonable person would have believed he could freely walk away from the interrogators."  *Id*.

An interaction between a suspect and a law enforcement officer constitutes "interrogation" if it involves "questioning initiated by law enforcement officers" after the person has been taken into custody.  *Miranda*, 446 U.S. at 444.  *Miranda* protection extends only to those who, while in custody, are interrogated by persons they know are acting on behalf of the government.  *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980).  The term "interrogation" refers to "express questioning or its functional equivalent."  *Id*. The functional equivalent of interrogation consists of "words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect."  *Id.* at 301.

Many methods of questioning are not considered interrogation and therefore do not require *Miranda* warnings.  For example, in *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990), the Supreme Court created an exception for "routine booking question[s]" used to secure biographical data necessary to complete booking or pretrial services.  Such questions are exempt if they are "requested for record-keeping purposes" and "appear reasonably related to the police's administrative concerns."  *Id*. at 601-02.  Other forms of questioning that are not interrogation under *Miranda* include routine border questioning, *United States v. Galindo-Gallegos*, 244 F.3d 728, 730-32 (9th Cir. 2001); general on-the-scene questioning, *United States v. Davis*, 530 F.3d 1069, 1081-82 (9th Cir. 2008); and questioning by private individuals on their own initiative, *United States v. Roston*, 986 F.2d 1287, 1292 (9th Cir. 1993) *amended by United States v. Roston*, 83 F.3d 430 (9th Cir. 1996).

After a defendant invokes his *Miranda* rights, the police must cease all questioning.  *Miranda*, 384 U.S. at 473-74.  If the right to remain silent is clearly invoked, further questioning is permissible only if law enforcement officials "scrupulously honor" the defendant's assertion of that right.  *See Michigan v. Mosely*, 423 U.S. 96, 103-04 (1975); *Anderson v. Terhune*, 516 F.3d 781, 784 (9th Cir. 2008) (finding invocation of right to silence not scrupulously honored because detective continued questioning after defendant said "I don't even wanna talk about this no more," "I'm through with this," and "I plead the Fifth.").

**III.   Analysis.**

**A.   July 2, 2010, La Quinta Hotel.**

To determine whether Defendant was in custody and therefore entitled to *Miranda* warnings in the hotel room on July 2, 2010, the Court will apply the Ninth Circuit's five-factor test.  *Kim*, 292 F.3d at 974.  First, the officers used no specific language to summon Defendant.  He was one of five occupants in the room and his statements were made in response to questions posed to all of the occupants.  Defendant's responses were volunteered, not compelled.  Second, the officers did not confront Defendant with any evidence of guilt.  Third, the physical surroundings of the questioning were the hotel room where Defendant and others had been staying.  Defendant was not taken to a different, more isolated location.  Fourth, the detention during the questioning was brief.  Defendant was not detained for any significant period before being asked questions.  Finally, no pressure was applied to Defendant.  Staugh granted permission for the officers to enter the room, no occupant was arrested or handcuffed, no weapons were brandished, and the officers accepted the decision of the occupants not to consent to a search of the room.  Although the occupants were detained while a search warrant was obtained, Defendants' answers to the questions in the hotel room occurred before such detention.  Moreover, the fact that the occupants felt free to decline the officers' request to search shows that they were able to exercise independent judgment during this encounter.

Applying the *Kim* factors, the Court concludes that the statements made by Defendant in the hotel room were not made during a custodial interrogation that required a *Miranda* warning.  The statements will not be suppressed.

**B.    July 2, 2010, Police Station.**

The pre-*Miranda* questions about height, birthday, and place of residence, and the banter about cars and the weather, were either standard booking questions or not likely to elicit an incriminating response.  *See Muniz*, 496 U.S. at 601-02.  They involved no *Miranda* violation.  Defendant asked during this exchange about "Charles" and "Domonic," and said he figured they were all there.  These statements were not made in response to interrogation and need not be suppressed.

The officer's pre-*Miranda* question regarding the rental car does not fall within any of the exceptions to *Miranda* established by Supreme Court or Ninth Circuit precedent.  The rented car was potentially connected to illegal activity for which Defendant had been arrested, and questions about Defendant's relation to the car were likely to elicit an incriminating response.  Because Defendant was not advised of his rights before this question, his response must be suppressed.

Whether or not Defendant's first invocation of his right to counsel under *Miranda* was ambiguous, his second clearly was not.  He stated that he wanted his lawyer present before answering questions.  The officers nonetheless proceeded to ask Defendant how much money he had in the hotel room, whether $2,500 found in the hotel room belonged to him, the location of Defendant's money in the room, the kind of pants the money was in, and which duffle bag in the room belonged to Defendant.  These questions were likely to elicit incriminating statements regarding the alleged drug activity related to the room, and the Court will grant the motion to suppress them.[1]

---

[1] The government states that it does not plan to use these statements as substantive proof during its case in chief (Doc. 331 at 8), but asserts that they may be used for impeachment.  *Id*.  The Court will address this issue during trial, but notes that cases have permitted such statements to be used for impeachment in some circumstances.  *See Harris v. New York*, 401 U.S. 222 (1971) (holding that a statement which was inadmissible against defendant in prosecution's case in chief due to a *Miranda* violation, but which otherwise satisfied legal standards of trustworthiness, was properly used to

**C.     October 25, 2012, Defendant's Residence.**

When Defendant was taken into custody during the search of his home, he was asked questions by SA Moran.  Defendant confirmed that he knew police were outside his house and said he was glad he did not grab his "gauge."  SA Moran's line of questioning at Defendant's residence falls within the exceptions to *Miranda* for purely administrative questions, *United States v. Salgado*, 292 F.3d 1169, 1172 (9th Cir. 2002) (asserting that questions posed solely for administrative purposes are not covered by *Miranda* where the agent has no reason to believe responses will be incriminating), and for basic investigatory questions during execution of a search warrant, *Davis*, 530 F.3d at 1081-82.

Defendant's subsequent statement muttered to himself – that he was glad he did not grab his "gauge" when the police arrived – is also not covered by *Miranda*. Spontaneous statements made by a suspect are admissible, regardless of whether *Miranda* warnings are given.  *See Edwards*, 451 U.S. at 485 (holding that *Miranda* does not prohibit the police from merely listening to voluntary statements made by a person in custody and using them at trial); *United States v. Edmo*, 140 F.3d 1289 (9th Cir. 1998) (finding that suspect's blurted statement "It probably won't be clean" should not be suppressed where officer requested a urine sample).

**D.     October 25, 2012, Police Station.**

Pre-*Miranda* statements made by Defendant before Detective Westover said anything, such as yelling to others in the office, need not be suppressed.  *See Arizona v. Mauro*, 481 U.S. 520 (1987).  After the defendant in *Mauro* invoked his *Miranda* rights, police officers permitted the defendant to speak with his wife in an interview room and an officer remained in the room and recorded the conversation.  *Mauro* held that statements made by the defendant to his wife could be used at trial.  *Id*. at 530.  *Mauro*

---

attack the credibility of defendant's trial testimony); *United States v. Patane*, 542 U.S. 630 (2004) (affirming *Harris* and holding that statements obtained in violation of *Miranda* may be used to impeach defendant's testimony at trial so long as they were not compelled).

1   explained that *Miranda* and *Edwards* are directed at "preventing government officials

2   from using the coercive nature of confinement to extract confessions that would not be

3   given in an unrestrained environment," and that none of those concerns were implicated

4   in the defendant's voluntary statements to his wife.  *Id.* at 529.  *Mauro*'s reasoning

5   applies here.  Defendant's shouted statements to others in the jail and his related

6   statements to Detective Westover were made in custody, but they were not made in

7   response to interrogation.  The Fifth Amendment does not prevent police officers from

8   listening to and using such voluntary statements.  *Edwards*, 451 U.S. at 485.

9       Defendant's statements made in his subsequent conversation with Detective

10  Westover must be suppressed.  The questions posed by Westover were not "reasonably

11  related to the police's administrative concerns" or any other exception to *Miranda*.

12  *Muniz*, 496 U.S. at 601-02.  Westover had no apparent administrative need to determine

13  if Defendant remembered him, nor to ask Defendant if he had any questions.   The

14  government argues that it was Defendant who re-initiated further communication with

15  Westover, but Westover did not "scrupulously honor" Defendant's invocation of his

16  *Miranda* rights because he never stopped talking with Defendant after his rights were

17  invoked.  Although Westover assured Defendant that the interrogation was over, his offer

18  to answer questions was likely to elicit incriminating statements or inculpatory questions

19  – precisely what Defendant did.   Police initiation of such conversations constitutes

20  interrogation under *Miranda*.  *See Innis*, 446 U.S. at 301.

21      **IT IS ORDERED** that Defendant's motion to suppress statements (Doc. 311) is

22  **granted in part and denied in part** as follows: (1) none of Defendant's statements made

23  on July 2, 2010, at the La Quinta hotel room are suppressed; (2) Defendant's pre-

24  *Miranda* statement at the police station on July 2, 2010, about the rental car and all of his

25  statements about ownership and location of money found in the hotel room, ownership of

26  a duffle bag, and ownership of pants in which money could be found are suppressed; (3)

27  none of Defendant's statements made on October 25, 2012, at his residence are

28  suppressed; and (4) Defendant's statements made in his conversation with Detective

Westover on October 25, 2012, are suppressed.

Excludable delay pursuant to U.S.C. § 18:3161(h)(1)(D) is found to run from 8/30/2013.

Dated this 17th day of October, 2013.

David G. Campbell
United States District Judge